Ronald Abramson
David G. Liston
**LEWIS BAACH pllc**
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 826-7001

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WAG ACQUISITION, L.L.C.**, <br><br> Plaintiff, <br><br> v. <br><br> **MFCXY, INC.;** <br> **LRAM COMPANY B.V.;** <br> **LEONID RADVINSKY;** <br> **CYBERTANIA, INC.;** <br> **ACTIVESOFT, INC.; and** <br> **DOES 1-20**, <br><br> Defendants. | Case No.: **2:14-cv-3196-ES-MAH** <br><br><br> **FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff WAG ACQUISITION, L.L.C., for its First Amended Complaint against Defendants, alleges infringement of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839 (the "patents-in-suit"). Defendants provide live, interactive adult "webcam" services on the Internet. Plaintiff alleges that

Defendants, operating without authority or license, rely on Plaintiff's patented streaming technology to conduct this business, thereby infringing Plaintiff's patents.  Plaintiff seeks appropriate compensation for Defendants' infringement.

## THE PARTIES

1.     Plaintiff WAG Acquisition, L.L.C. is a New Jersey limited liability company with its principal place of business at 3 Gold Mine Road, Suite 104, Flanders, New Jersey 07836.  Plaintiff operates an Internet broadcasting business based in New Jersey, under the trade name SurferNETWORK.

2.     On information and belief, Defendant LEONID RADVINSKY ("Mr. Radvinsky" or "Defendant Radvinsky") is a naturalized U.S. citizen with a residence address at 2123 Warwick Lane, Glenview, Illinois.

3.     On information and belief, Defendant MFCXY, Inc. ("MFCXY") is a purported Illinois Corporation, with its principal place of business at 2123 Warwick Lane, Glenview, Illinois.

4.     On information and belief, Defendant ACTIVESOFT, INC. ("ActiveSoft") is a purported Illinois Corporation, with its principal place of business at 2123 Warwick Lane, Glenview, Illinois.

5.     On information and belief, Defendant CYBERTANIA, INC. ("Cybertania") is a purported Illinois Corporation, with its principal place of business at 2123 Warwick Lane, Glenview, Illinois.

6.     On information and belief, Defendant LRAM COMPANY B.V. ("LRAM") is (or at times relevant hereto was) a purported legal entity organized under the laws of the Netherlands, with its principal place of business at Dokweg 27 B, 1976CA IJmuiden, The Netherlands.

7.     On information and belief, Defendants DOE 1 – DOE 20 (the "Doe Defendants") are individuals or entities whose precise identities are unknown to Plaintiff at this time, which operate in concert with and/or under the direction and control of Defendants Radvinsky, MFCXY, ActiveSoft, Cybertania and/or LRAM in connection with the conduct complained of herein.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b), in that, *inter alia* (as hereinafter alleged in detail), a substantial part of the events or omissions giving rise to the claims herein occurred in New Jersey, and in any case each Defendant is subject to the personal jurisdiction of this Court with respect to the matters in dispute in this action.

## PLAINTIFF'S BUSINESS AND DEVELOPMENTS

10.     Plaintiff, operating under the trade name SurferNETWORK, is in the business of providing Internet broadcasting services for live and on-demand audio

and video program material.  Plaintiff began this business in 1998 and has been one of the leading providers of such services to the terrestrial radio stations and other content providers that comprise its customer base.

    **11.**    Early in developing its business, two of Plaintiff's principals, William A. Grywalski, ("Grywalski") and Harry Emerson ("Emerson"), recognized a need that existed in the field of Internet delivery of broadcast media due to the shortcomings in then current Internet streaming technologies.  They observed that long startup delays due to "buffering" and frequent program interruptions (sometimes referred to as "jitter") made the experience of trying to listen to or view streaming Internet content frustrating to the end user, and therefore impractical as a content delivery mechanism.  They were interested in making the Internet streaming experience more like radio or television, including the immediacy of having the programming appear to start instantly on demand (*e.g.*, turning on a radio or flipping channels), and continue playing once started without random interruptions.

    **12.**    Plaintiff engaged the assistance of a software design engineer, Harold Price ("Price"), to develop solutions for the shortcomings that Grywalski and Emerson saw in the current technology, with respect to streaming media playback performance, as well as other technological issues concerning Internet delivery of broadcast media.  Price worked on several aspects of this matter for Plaintiff over the period 1999-2001.

**13.**     Price was aware of the then current approach to streaming, which attempted to overcome streaming transmission delays and jitter by a variety of techniques, including, for example, establishing a content buffer of 20-seconds or so in duration, on the receiving (user or "client") end of the communication, within the client's media player or media player browser plugin.  After the user selected (*e.g.*, clicked on) a stream, the player would start filling this buffer at the playback rate and then start playing when the buffer was full.  While this method did provide some protection against interruptions for the duration of whatever content was initially buffered, it entailed an undesirable startup delay for "buffering" and provided no means for graceful recovery once the 20 seconds worth of content in the buffer was consumed.

**14.**     Price conceived of solutions to these problems.  He built a prototype that implemented one embodiment of those solutions, and he demonstrated that a system according to his new design could overcome the problems put to him by Grywalski and Emerson.

**15.**     Plaintiff and its predecessors in interest filed a number of U.S. patent applications on these solutions, as enumerated below.  To date, these applications have resulted in a number of issued U.S. patents, including the patents-in-suit.  All of these patent applications were assigned to Plaintiff, or to a predecessor-in-interest of Plaintiff and reassigned to Plaintiff.

**16.**     Plaintiff has been conducting an active, operating business ever since the developments described above and has actively practiced under the technology

taught in the patents-in-suit from then to the present.  Plaintiff has developed commercial arrangements under which it streams content for numerous terrestrial radio stations and content providers in New Jersey, regionally, nationally, and internationally.  It also provides a One-Click Royalty Reporter<sup>TM</sup> for radio stations to report streaming media performance royalty information to SoundExchange (a performing rights organization that collects royalties on the behalf of sound recording copyright owners ), among other services.

## DEFENDANTS' BUSINESS ACTIVITIES

17.     The time period relevant to the patent infringement alleged herein runs from at least as early as February 2, 2012, the date that the first of the patents-in-suit issued from the United States Patent & Trademark Office, to the present. (Plaintiff further reserves the right to allege infringement of its earlier patents, and to allege infringement of its provisional patent rights under 35 U.S.C. § 154(d), as information developed in discovery in this case may warrant.)  Thus, all conduct of the Defendants during said period is relevant to determining their liability and financial responsibility for infringing the patents-in-suit.  The allegations of Defendants' conduct herein should accordingly be understood to refer to conduct and courses of conduct occurring, continued, and/or repeated in whole or in part within said period.

### A. Defendants' Business Model

18.     Defendants, operating under the direction and control of Defendant Radvinsky, operate and during the relevant period, have operated, a network of

adult live interactive webcam performers and Internet sites, led by their flagship site, MyFreeCams.com, alleged herein to have infringed and currently be infringing the patents-in-suit.  The enterprise comprised of Defendant Radvinsky and the Defendant corporations that he has created in the course of carrying out his business ventures are collectively referred to herein as "MFC."  The manner in which Defendant Radvinsky dominates and controls the MFC enterprise and in which he and the other participants therein are responsible for MFC's tortious conduct is alleged in detail *infra*.

19.    MFC attracts business to its web sites by providing the perception of "free" entertainment.  However, most services on MFC's sites, beyond initial noninteractive viewing, are provided on a "pay to play" basis, through credits and tokens purchased via credit card.

20.    MFC's Internet sites include, in addition to MyFreeCams.com, hundreds of additional web sites that forward traffic to or share facilities or branding with MyFreeCams.com, including without limitation MyFreePaysite.com (a pornographic "Portal" site); UltraXXXPasswords.com (a site that presents the deceptive image of providing "hacked" (stolen) passwords to get free services from other pornographic sites, but which is in fact a lucrative affiliate referral site); CamWhores.com (a site featuring archived webcam performances and selected live streams for members); and ethnic and fetish-themed variations of MyFreeCams.com (*e.g.*, MyFreeAsianCams.com, MyFreeLatinCams.com, etc.), which automatically redirect the user's browser to the corresponding sections of

MyFreeCams.com or other affiliated sites.  MFC is also involved in "co-branded" sites in which MFC owns the domain, including MyFreeNubilesTube.com, a site featuring explicit depictions of hard core sex with teenage girls, thereby generating additional revenues from MFC's "MyFree[porn reference]" web franchise.

21.   MFC claims that MyFreeCams.com is "the largest webcam site in the world" and "the #1 adult webcam community."  The affiliate marketing site Crakrevenue.com similarly claims that the MyFreeCams.com web site is "the biggest webcam modelling [sic] website on Earth."  MFC claims that MyFreeCams.com has "over 30 million unique visitors per month"; "over 15 million registered members"; and "over 100,000 registered models."

22.   MFC also claims that "[m]ore money is spent on MyFreeCams.com than on any other webcam site in the world."  Whether or not this claim is literally true, on information and belief MFC's live webcam streaming business generates and throughout the period relevant hereto has generated hundreds of millions of dollars per year in annual revenues.  These revenues are derived from consumer payments via credit card for the performances of individual webcam performers, as well as advertising, commercial tie-ins, and other forms of Internet content monetization.

**B. Defendants' Internet Streaming Operations**

23.   MFC's business and competitive position has been and continues to be critically dependent on streaming performance, including fast startup times when a user clicks on a stream, and smooth and uninterrupted delivery when the

streaming delivery starts.  MFC claims to be "one of the most technologically advanced websites on the Internet," and that "[w]e love pushing the envelope of technology."

24.     MFC's critical need for advanced streaming technology is further evidenced, *inter alia*, by MFC's recent introduction of a mobile version of MyFreeCams.com (m.MyFreeCams.com), which aims to utilize enhanced technologies to improve streaming performance to users who wish to use MFC's services on mobile devices.  MFC's introduction of its mobile site multiplied MFC's already widespread infringement of WAG's patents.

25.     Providing streaming media over the Internet requires costly resources. As MFC itself states on its CamWhores.com web site, "[t]he bandwidth costs of doing streaming video far exceed what nearly every amateur webcam operator can afford."  Conserving costly bandwidth and at the same time achieving satisfactory streaming performance is a major task that involves careful selection of streaming server technologies, careful decisions as to which user playback platforms to support, and close attention to system configuration and deployment.

26.     To achieve these performance requirements for its business, MFC deploys and controls streaming media servers situated at locations within the United States, which are configured and operated in a manner that infringes the patents-in-suit, as hereinafter set forth.  MFC uses Plaintiff's patented technologies to achieve the high performance on both desktop and mobile platforms required in order for it to remain competitive in the market.

27.     Defendants' services on the Internet are provided by computers, referred to as "servers."  Each such server is reachable over the Internet by its "address" on the Internet, referred to as its Internet Protocol (IP) address.  Every device publicly accessible on the Internet has its own globally unique (*i.e.*, non-duplicated) IP address.

28.     Internet domain names and IP addresses are given out, generally in "blocks" of multiple adjacent addresses, by a process that involves registration with accredited registrars.

29.     A given IP address will be assigned to a registrant at a listed business address, but the IP address can be used at any physical server authorized by the registrant.  The registrant can locate its servers anywhere it wishes, geographically, and use the IP addresses it owns (or rents) to identify those servers on the Internet.  The physical location of the server will bear upon the speed at which content can be delivered to users.  Generally, the closer the server is to the user, the better the delivery will be.  In high-volume operations, where performance is important, multiple servers may be deployed over a "Content Distribution Network" (CDN), in a manner such that individual users will be directed to different servers based on their proximity to the respective servers.

30.     IP addresses are represented as a four-part string of numbers, in the format of four numbers, each in the range 0-255, separated by dots – as in, for example, 192.22.245.2 – resembling a telephone number.  To make the Internet addressing system more user-friendly, the numeric IP addresses are often given

names ("domain names"), such as google.com or ebay.com, so that users can reach the desired services by a memorable name, rather than a number (*e.g.*, www.google.com as opposed to 74.125.228.80).  An Internet mechanism called the Domain Name Service (DNS) maps the domain names to the numeric IP addresses of the machines that serve content for the domains, so that the requests directed to domain names (*e.g.*, google.com) will reach the proper numerical IP addresses (in this example, 74.125.228.80), and thereby the proper servers.  "Subdomains" may also be assigned within individual domains, for example, **www**.google.com, **mail**.google.com, **voice**.google.com, etc.  Each subdomain represents a different server reachable through the main domain (google.com), but mapped to a separate IP address.  (That is, the subdomain mail.google.com (aka "gmail") maps to 74.125.228.246, as opposed to the 74.125.228.80 address for the main google.com search engine site.)

31.    The web site www.MyFreeCams.com serves the content for the primary web page at the MFC's domain MyFreeCams.com.  The IP address associated with www.MyFreeCams.com (and MyFreeCams.com itself) is 207.229.75.17, which is in the IP address block 207.229.75.0/24 registered to MetaPeer, an Internet Service Provider in Newcastle, Washington.  The Internet Traceroute utility indicates that this server is physically located in the Seattle, Washington area.

32.    A user of the MyFreeCams.com web site can click on one of the many images of available performers in order to view the selected performer's live

webcam stream.  The stream will then be served from one of a number of physical servers operated by MFC, using one of a number of available protocols and streaming methods.  MFC's selection of the server, protocol, and method to serve the stream will depend on the type of viewing apparatus ("Player") being used by the user.

33.    "Players" can include, *inter alia*, desktop computer Internet browsers, Internet browsers on smartphones and tablets, and dedicated media players and media player facilities on mobile, desktop, "set top box," and other platforms.

34.    In each case, the electronic request from the Player, to view streaming content, is preceded by a "header" in the communications stream.  MFC's server infrastructure extracts identification information from these "headers," which it uses in order to identify the user's Player, and then selects what it determines is the best server, protocol, and delivery method suited to the identified Player.

35.    Where MFC's servers detect that the users' Player is an ordinary desktop web browser, the live stream will be served via the "RTMP" protocol (Real Time Messaging Protocol) from an MFC streaming server with a name such as video418.myfreecams.com, at an address in the IP address block such as 207.229.74.0/24, also registered to MetaPeer and served from the Seattle, Washington area.  These streams are served in a manner that directly infringes Plaintiff's '611 and '839 patents as alleged in detail in Counts V and VI below.

36.    Where MFC's servers detect certain types of mobile Players (*e.g.*, iOS, Android 4.4), or certain browsers having corresponding capabilities (*e.g.*,

Safari, mobile Chrome browser), the live stream will be served via the "HTTP" protocol (Hypertext Transfer Protocol) from different "ports" on the same MFC video418.myfreecams.com server, or similar servers, in IP address blocks including 208.93.88.0/24 and 207.229.71.0/24, also from a MetaPeer facility in the Seattle, Washington area.  These streams are served in a manner that directly infringes (and also induces infringement of) Plaintiff's '141 and '011 patents as alleged in Counts I - IV below.

**C. MFC's Contacts with New Jersey**

37.    The hundreds of millions of dollars derived by MFC from its infringing activities includes millions of dollars of revenues from monies spent on MFC web sites by New Jersey residents.

38.    MFC does not just passively transmit broadcasts over the Internet in the hope that New Jersey residents will use their services.  Rather, MFC purposefully and systematically avails itself of New Jersey as a business venue, regularly putting "feet on the ground" in New Jersey to promote MFC's infringing services to users and prospective performers in the "Garden State."

39.    MFC has been a major sponsor of the Exxxotica Expo, a trade exhibition conducted in multiple locations, including separate shows conducted annually in each of Edison and Atlantic City, New Jersey.  In 2010, MFC became a major sponsor of Exxxotica Expo.  It had advertising banners and large booths at one or both of the Exxxotica Expo New Jersey shows in each of the years 2010 – 2014 and is scheduled to participate in the Exxxotica show in Edison, New Jersey

on November 7-9, 2014.  Exhibit A hereto contains screen shots of videos showing the well-staffed MFC booths at New Jersey show venues for each of the years 2010-2013 and an advertisement for MFC's participation in the forthcoming November 2014 show in Edison.  Links to these videos are provided by MFC at its own site, at http://wiki.MyFreeCams.com/wiki/Tradeshows.  The links provided are to a repository called "MyFreeCams TV" on vimeo.com, at the URL http://vimeopro.com/myfreecams/mfc-tv, where all of the New Jersey videos may be viewed.  Each video shows a prominent and robust physical presence by MFC in New Jersey.  The purpose of these shows is both to promote MFC's infringing services to prospective New Jersey users and also to recruit webcam performers from New Jersey.  Judging from the repeated and regular nature of this activity in New Jersey, it is reasonable to infer that MFC has been successful in generating a substantial proportion of its revenues from New Jersey.

40.     MFC also controls an Internet domain named MyFreeNubilestube.com, which caters to adults with sexual interests in young teenage girls.  This MFC site specializes in girls engaged in various sex acts, represented to be at least 18 years old but presented in a manner suggesting that many of them are underage, with categories for "braces," "socks," "short girls," "small boobs," etc.  On information and belief, MyFreeNubilesTube.com is served from a physical location in Weehawken, New Jersey.

**41.**    MFC has recruited a large number of webcam performers in the U.S.,
Western and Eastern Europe, Asia, Africa, South America, and elsewhere. As
noted, MFC claims to have 100,000 such performers.

**42.**    Defendants' worldwide retinue of performers includes numerous New
Jersey residents, who perform online over Defendants' infringing services, from
New Jersey, using server facilities provided by Defendants.  Browsing the
MyFreeCams.com web site reflects the active participation of numerous New
Jersey performers on that site (*e.g.*, "Jersey Girl," "Italian Guidette from the Jersey
Shore," "Anjel_Kitten" from "New Jersey," "AmySativaXXX... come toke and
stroke with Jersey girl," "JerseyPride6… I am a single guy from New Jersey," "I
am Alicia a romanian girl living in New Jersey," "Jersey_Girl… South Jersey,"
"absuloot7… jersey shore," SexyMomma25… Jersey Shore," "JennJewelz…
Ocean County College, New Jersey," "Butterfly77… MILF… New Jersey,"
"LethalBarbie… Perth Amboy," etc.).  A search of the site for references to New
Jersey generates approximately 300 hits.  The streams of each of these performers
originates from live performances in New Jersey and infringes one or more of the
patents-in-suit.

**43.**    MFC's induced infringement as alleged herein also implicates New
Jersey, because for every New Jersey user of the infringing streams, the underlying
direct infringement that MFC induces takes place in New Jersey.  Every stream
sent by Defendants from the servers identified in Par. **36** represents infringement
by MFC in operating its servers, but in addition, each and every such stream also

causes a direct infringement by a consumer who uses an infringing Player and/or Player Software to view the stream.  As alleged in Counts II and IV below, MFC induces this infringement in violation of 35 U.S.C. § 271(b).  Because MFC has a substantial volume of users in New Jersey, and a substantial portion of those users receive their streams from the servers identified in Par. **36**, MFC accordingly causes a substantial amount of such direct infringement to occur in New Jersey.

44.     Defendant Radvinsky is personally subject to the jurisdiction of this Court by reason of his personal responsibility for MFC's infringing conduct directed at New Jersey, as alleged above.  As alleged in detail below, Defendant Radvinsky personally directs and controls such infringing activity.  The MFC enterprise is in reality a sole proprietorship of Mr. Radvinsky; the MFC corporate defendants act as agents for Mr. Radvinsky in carrying out such infringement (including without limitation the acts related to infringement occurring in New Jersey).  To the extent any such corporations participate in such infringement, they do so as alter egos of Mr. Radvinsky.

### D. The Defendants' Responsibility for the Tortious Conduct of the MFC Enterprise

### (1)  Defendant Radvinsky

45.     The identification of who is behind MFC has been the subject of deliberate obfuscation, as will be addressed below.  The indicia of ownership of MFC's web sites has consistently pointed directly to Mr. Radvinsky, though he has set up numerous corporations whose names occasionally appear in various

connections with no clear indication as to their respective roles.  The one and only consistent presence throughout is that of Defendant Radvinsky.

46.     Since Mr. Radvinsky is a citizen of Illinois and since his more recently active corporations are all Illinois corporations, the question of Mr. Radvinsky's personal liability for the matters alleged herein must be decided under Illinois law.

47.     Under Illinois law, a corporate officer such as Mr. Radvinsky can be held liable for tortious conduct (including patent infringement) in which the officer had substantial personal participation and control.  Under Illinois law, a corporate officer's status does not insulate him from individual liability for the torts of the corporation in which he actively participates.  Thus a corporate officer may be liable for the tortious conduct of the corporation in which he actively participated, and such liability may be found with or without "piercing the corporate veil."

48.     Further (and/or alternatively), under Illinois law, the corporate form may be disregarded ("piercing the corporate veil"), with the result that the officer becomes personally liable for *all* of the corporation's liabilities, based on a two-part test: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.  This test was tailor-made for situations such as Mr. Radvinsky's use of the various entities comprising MFC.

**49.**     Plaintiff alleges – as have others (as will be discussed below) – that MFC, including its constituent "corporations," is effectively operated as a sole proprietorship of Mr. Radvinsky.  Mr. Radvinsky completely dominates every aspect of each of the Defendant corporations' existence and operations, including the operations related to the allegations of infringement herein.  Plaintiff alleges that these facts (as individually set forth below) more than satisfy the Illinois personal direction and control analysis (above), for which Plaintiff need not pierce the corporate veil.

**50.**     The facts presented here also satisfy the "unity of interest and ownership" part of the test under Illinois law for piercing the corporate veil.

**51.**     As will be alleged in detail below, Mr. Radvinsky uses his various corporations as mere agents to carry out his business operating tactics on his behalf.  He interposes these entities, interchangeably, as his alter egos when he wishes to enjoy the advantages of incorporation.  Adherence to the fiction of a separate corporate existence for Mr. Radvinsky's various corporations named herein as Defendants would sanction or promote fraud, injustice, and inequitable consequences, satisfying the second branch of the Illinois test for piercing the corporate veil.

**Dominant Personality**

**52.**     Defendant Radvinsky is the only individual who has ever been held out as an executive-level officer of any of the Defendant corporations.  In the numerous news stories that have mentioned MyFreeCams.com and other MFC

sites, Mr. Radvinsky is the only person, other than webcam models, who has been identified by name in connection with these sites.  Mr. Radvinsky is the only person who has ever been quoted in any news release concerning the MFC sites. Mr. Radvinsky is the only person (again, other than webcam models) who has spoken for or otherwise been mentioned by name in connection with the adult industry awards that have been given to MFC since 2010, including the XBIZ Award for Live Cam Site of the Year for 2011, 2012, and 2013.  In an interview concerning his business in XBIZ World in January 2011, Mr. Radvinsky did not mention a single other employee of his enterprise (again, other than webcam models).  In a series of nine arbitration proceedings brought by MFC to oust the registrants of domain names similar to MFC's "MyFree [porn reference]" domain name construction, Mr. Radvinsky was on each occasion the sole representative appearing on behalf of MFC.  On information and belief, MyFreeCams is widely associated with Radvinsky personally.  Numerous webcam performers report direct business communications with Mr. Radvinsky personally, and complaints against the site regularly appear in "Ripoff Report" and the Better Business Bureau (19 complaints, rated "D+"), naming Mr. Radvinsky personally.

**53.**   A search of LinkedIn.com and other leading "resume" sites shows no individual other than Defendant Radvinsky who identified themselves as having ever worked (other than as a webcam model) for a corporation responsible for operating MyFreeCams.com or any other MFC site.  By all appearances, apart

from webcam models and a small handful of low-level personnel, MFC is a "one-man" operation by Mr. Radvinsky.

54.     Numerous blog postings by MFC performers, and complaints by MFC users, uniformly single out Defendant Radvinsky as the authoritative decisionmaker for MFC, who acts unilaterally and decisively with respect to all policy questions regarding MFC sites.  The only identification used by Defendant Radvinsky in communicating these decisions is not any corporate title, but rather the "handle" "AdminLeo."  As "AdminLeo," Defendant Radvinsky determines all policy issues in the management of MFC's Internet sites.

55.     In litigation earlier this year with Perfect 10, Inc., also concerning infringement taking place in connection with MyFreeCams.com, Mr. Radvinsky, was asked in interrogatories to identify, as of the end of 2013, each of the employees of his corporate group, defined in that case in a manner that would include every entity named as a defendant in the present case.  In his response to those interrogatories, signed February 10, 2014 under penalty of perjury, Mr. Radvinsky identified only himself.

**Consistently Named Personally as the Responsible Figure**

56.     Defendant Radvinsky has a long history of being sued in his personal capacity for infringement and frauds committed through his web sites, including MyFreeCams.com and MyFreePaysite.com.  The plaintiffs in such actions have consistently named Mr. Radvinsky personally as a defendant, as reflected in the list of cases below:

- *Amazon.com, Inc. v. Cyberpower Pty, Ltd.*, et al., C03-2620P (W.D. Wash. Aug. 25, 2003).  Amazon sued Mr. Radvinsky personally, Defendant ActiveSoft (spelled as ActivSoft), and a number of other parties for sending massive quantities of forged and fraudulent "Spam" emails falsely and deceptively claiming to be from Amazon.com.  The amended complaint filed by Amazon alleged that the sites to which the Spam emails directed consumers were registered by Mr. Radvinsky and nominally operated by ActivSoft but that Mr. Radvinsky acted individually and used ActivSoft as an agent.  The court entered judgment by default pursuant to Fed. R. Civ. P. 37(b)(2)(C) for discovery misconduct by Mr. Radvinsky.  Shortly thereafter, Mr. Radvinsky settled this case by consenting to a permanent injunction, naming him in his personal capacity.

- *Microsoft Corp. v. Radvinsky et al.*, CV4-2033 (W.D. Wash.. Sep. 27, 2004). Microsoft sued Mr. Radvinsky personally, Defendant ActiveSoft (again spelled as ActivSoft), and a number of other parties for sending massive quantities, in this case "hundreds of millions" of forged and fraudulent "Spam" emails falsely and deceptively claiming to originate from Hotmail.com and other Microsoft domains.  Similar to Amazon's action, Microsoft's complaint alleged that the sites to which the Spam emails directed consumers were registered by Mr. Radvinsky and nominally operated by ActivSoft but that Mr. Radvinsky acted individually and used ActivSoft as an agent.  Microsoft's complaint further alleged unauthorized access to Microsoft's computers in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5) and (g).  Mr. Radvinsky settled this case as well by consenting to a permanent injunction, which named him in his personal capacity.

- *Perfect 10, Inc. v. Radvinsky, et al.*, CV 99-7376-RAP (C.D. Cal. Jul. 19, 1999).  The action was for copyright and trademark infringement, and trademark dilution.  Mr. Radvinsky was named personally based on the allegations that the subject web sites (the same sites as involved here) were registered to Mr. Radvinsky, who was also identified as the

administrative, technical, and billing contact for each website; that his address was the same as Cybertania's (also named as a defendant in the action); and that neither Mr. Radvinsky nor Cybertania had designated an DMCA agent with the Copyright Office.  The action was settled.  Mr. Radvinsky signed the settlement agreement in his personal capacity.  Mr. Radvinsky admitted in the settlement that the court had personal jurisdiction over him, and the court retained jurisdiction.

- *Perfect 10, Inc. v. Radvinsky, et al.*, CV13-07279 (C.D. Cal. Oct. 2, 2013).  The action, like the 1999 action, was for copyright and trademark infringement, and trademark dilution, and breach of the prior settlement agreement.  The complaint alleged that the defendants utilized widespread infringement of Perfect 10's trademarks and copyrights to drive traffic to MyFreeCams.com.  Mr. Radvinsky is named personally based on the same allegations as previously, as well as on the basis of the prior settlement agreement.  Mr. Radvinsky resisted discovery in the matter.  The action was settled in March 2014, two days after a motion to compel discovery from Mr. Radvinsky had been fully briefed and was awaiting a court ruling.

57.     In the above-mentioned action against Mr. Radvinsky by Amazon.com, Mr. Radvinsky resisted discovery and became embroiled in discovery disputes.  The discovery disputes in the action led to a default judgment being ordered against Mr. Radvinsky and his corporations pursuant to Rule 37(b)(2)(C), on the grounds that he "*did not produce all responsive documents*," gave "*false information in documents that were produced*," and "*provided false testimony during deposition.*"

58.     On information and belief, the reason Mr. Radvinsky was named personally in the aforementioned other actions was the same reason he was named personally herein: he was the moving actor who authorized, controlled, directed, or

had the ability to authorize, control, and direct the actions complained of, and therefore was individually responsible.

59.     On information and belief, each of the plaintiffs in the aforementioned other legal actions, including Microsoft and Amazon, also proceeded against Mr. Radvinsky personally because it was obvious in those cases, as it is here, that his corporations were undercapitalized and had no substantial existence of their own such that the plaintiffs could collect a judgment or enforce a court order against them.  On information and belief, based on reading the pleadings and orders on file in these cases, Mr. Radvinsky was unable to secure the involuntary dismissal of any of these actions against him, and as soon as discovery proceedings or sanctions were imminent (or upon him), he settled each one with a stipulation and order, and/or settlement agreement, agreeing in substantial part to the relief that the plaintiff had sought.

**Non-Existent Lines Between Mr. Radvinsky, His Web Sites, and His Corporations**

60.     Mr. Radvinsky was served in this action on two separate occasions, once in person and the second time through an individual named Anna Radvinsky, both times at 2123 Warwick Lane, Glenview, Illinois, a single-family home. When accepting service herein for Defendant Radvinsky, Anna Radvinsky stated she was Mr. Radvinsky's wife.  However, on information and belief, Anna Radvinsky is in fact Defendant Radvinsky's mother.  The property at the 2123 Warwick Lane address is a single-family residence, in an area zoned as "Residential," held in the name of a trust, of which Anna Radvinsky is the sole

trustee.  On information and belief, Anna Radvinsky lives at the 2123 Warwick Lane address.

61.    The 2123 Warwick Lane address in Glenview Illinois, where Mr. Radvinsky's mother lives, is also given as the address of three of the corporate defendants herein – Defendants MFCXY, ActiveSoft and Cybertania.  On information and belief, none of these corporations has any apparent tangible assets, or any substance apart from the assets of Defendant Radvinsky personally.  Nor do any of these corporations have any clearly identified roles in the management or operations of MFC's web sites.

62.    MFC's principal site, MyFreeCams.com, does not name anywhere on the site a corporation (or indeed, anyone) who has been responsible for the operation of the site during the period of 2012-present that is relevant hereto.

63.    MFC has not designated any agent with the U.S. Copyright Office for notification of claims of infringement under the Digital Millennium Copyright Act, for any of MFC's sites.

64.    The MyFreeCams.com web site bears no copyright notice.  Other MFC sites, such as CamWhores.com, MyFreePaysite.com, and MyFreeNubilesTube.com do have copyright notices on their home pages, but purport to be copyrighted in the name of the corresponding Internet domains (*i.e.*, "CamWhores.com," "MyFreePaysite.com," and "My Free Nubiles Tube"), none of which is an actual legal entity.

65.    The Model Agreement and Privacy Policy on MyFreeCams.com purport to be between the user and "MyFreeCams.com," which is not a legal entity, thereby reflecting entering into contracts as a proprietorship.

66.    Mr. Radvinsky is known to have used other sham companies to register Internet domains.  In the above-mentioned action against Mr. Radvinsky and several of his corporations by Amazon.com, Inc., a web site material to the subject matter of the action had been registered by Mr. Radvinsky in the name of a purported entity named "Cyberpower Pty, Ltd." ("Cyberpower").  During his deposition in that action, Mr. Radvinsky claimed not to be familiar with Cyberpower.  On information and belief, the name Cyberpower was simply used in the domain name registration, but was not associated with a real entity.

**Mr. Radvinsky's Personal Role in, and Exclusive Responsibility For, Operations, Management, and Administration of Infringing Web Sites**

67.    In each and every domain name registration, for each and every MFC Internet site, during the relevant period identified herein and up to the date this action was filed, Mr. Radvinsky was designated as the owner and as the "Administrative," "Technical" as well as "Billing" contact for the domain. Consistent with these official designations, and consistent with all information available about how the MFC sites are administered (see paragraphs above), Defendant Radvinsky unilaterally and personally controls all aspects of the operation of the MFC Internet sites.  By designating himself as the "Technical Contact" for each and every web site involved in the infringing acts of those web

sites as alleged herein, Mr. Radvinsky was holding himself out as responsible for the technical operation of each such web site, and was in fact responsible for such technical operations and related decisionmaking and management.  Thus, Mr. Radvinsky actively participated in the tortious infringing conduct that is the basis of this Complaint, and his personal liability therefor may be found with or without "piercing the corporate veil."

**Undercapitalization and Commingling of Assets**

68.    On information and belief, none of the corporate Defendants herein have any tangible assets, and each is undercapitalized, in that none of them have sufficient assets to cover predictable corporate liabilities that arise in the operation of such businesses, such as the expenses of licensing third-party patents, which such corporations can expect to encounter in the ordinary course of business.

69.    On information and belief, Defendant Radvinsky commingles and interchanges the assets of the various corporations that he controls, to suit his convenience, disregarding any separate existence of such corporations.  For example, as mentioned above, MFC, represented by Mr. Radvinsky, has brought a series of arbitration proceedings against persons he views as encroaching on his "MyFree[porn reference]" family of domain names.  One such case was Claim No. FA1104001385375, filed April 24, 2011 before the National Arbitration Forum ("NAF"), concerning a registration for the domain "myfreecamvideos.com".  The Complainant in the arbitration was Defendant Cybertania, represented by Mr. Radvinsky.  Cybertania was asking to have the disputed domain name transferred

to it, on the basis of Cybertania's alleged superior rights.  Cybertania represented

to the arbitration tribunal that it owned a U.S. Trademark registration for the mark

MYFREECAMS.COM and that it owned the domain name MyFreeCams.com.

Neither representation was true.  In fact, the party seeking the domain name

transfer, the party owning the relevant trademark, and the party owning the

existing domain name registration at issue that was allegedly harmed, were three

different entities: the party seeking the transfer of the disputed domain to its name

was Cybertania; the party that owned the U.S. trademark registration was MFCXY;

and the domain was registered at the time in the name of "Leo Radvinsky."  On

information and belief, Mr. Radvinsky deliberately misrepresented these facts

because representing the facts correctly would have required at a minimum

transfers, powers of attorney, cross-licenses or other authenticated written

foundation in order to show Cybertania's entitlement to relief.  Mr. Radvinsky

knew no one would call him on these misstatements because the Respondent in the

case had defaulted.  Mr. Radvinsky's course of conduct in repeatedly disregarding

the separate corporate ownership of significant MFC corporate assets should

preclude him seeking to invoke the alleged separate identities of these corporate

entities here, in order to shield Mr. Radvinsky from personal liability.

**70.** Mr. Radvinsky repeated the same conduct in NAF Case No.

FA1205001445679, in which Cybertania, again represented by Mr. Radvinsky,

sought the transfer to it of the domain "myfreecam.co."  Cybertania (by Mr.

Radvinsky) falsely represented again, in a case where the Respondent had also

defaulted, that it owned the domain MyFreeCams.com and the U.S. trademark registration for the mark MYFREECAMS.COM, when the domain and mark were in fact owned by Mr. Radvinsky (as aforesaid) and MFCXY, respectively, and not Cybertania, and it would have been inconvenient (at best) to have correctly presented the true corporate record.

71.   MyFreeCams.com contains a "Statement" purporting to comply with 18 U.S.C. § 2257 (the Statement falsely represents that the site is exempt from 18 U.S.C. § 2257 but then purports to comply).  18 U.S.C. § 2257 provides that web sites such as MyFreeCams.com, which display sex acts, must display, in a specified manner, a "statement" of where records may be found to substantiate the age of the persons depicted in such acts.  Regulatory allowance is made to designate a non-employee "custodian of records" to provide this access.  However, 28 C.F.R. § 75.6(f) provides that if the provider contracts with a non-employee custodian of records to serve as the person responsible for maintaining his records, "the statement shall contain the name and business address of that custodian."  In its Statement, MyFreeCams.com designates "MyFreeCams.com" – which is not any existing entity – as the "custodian" of records.  This circular self-designation of a non-entity with no further information again reflects that MFC's web sites are run as sole proprietorships of Defendant Radvinsky, and that whatever corporation(s) that Mr. Radvinsky would allege to be responsible have no real connection to his sites and no real responsibility for their administration.

72.     On information and belief, Mr. Radvinsky receives a direct financial benefit from the infringement complained of herein.

**Deliberate Efforts to Eliminate Identifying Records**

73.     Furthermore, it is most telling, and evidence of Mr. Radvinsky's consciousness of guilt, that immediately after the initial service of process in this action on May 22, 2014, he began changing all of the domain name registrations for the MFC web sites to hide his personal participation.  For years, these registrations had all listed Mr. Radvinsky as the owner, Administrative, Technical and Billing contact for these sites.  Upon being served in the instant action, he suddenly and systematically began changing these registrations to hide all information naming him personally, beginning with MyFreeAsianCams.com on May 25, 2014; MyFreeNubilesTube.com and MyFreePaysite.com on May 26, 2014; Ultrapasswords.com on May 30, 2014; MyFreeCams.com on May 31, 2014; Ultraxxxpasswords.com on June 12, 2014; CamWhores.com on June 18, 2014; MyFreeLatinCams.com on June 25, 2014, among many others.

74.     On information and belief, this wholesale transfer, which occurred immediately upon this suit becoming known to Mr. Radvinsky, is evidence of his personal recognition of liability herein.

**Mr. Radvinsky is Personally Liable Without Piercing the Corporate Veil, but Piercing the Corporate Veil is Independently Justified**

75.     Based on the foregoing, Plaintiff alleges that Mr. Radvinsky at all times relevant hereto has served as the "mastermind," directing and controlling the

infringing activities complained of herein, and therefore is individually responsible for those acts, with or without piercing the corporate veil.

76.    In addition, the Defendant corporations and any other corporations and entities that Mr. Radvinsky would assert are responsible for the wrongs alleged herein were at all such times, and currently are, undercapitalized sham entities that are not entitled to be recognized as shielding Mr. Radvinsky from personal liability.  The foregoing allegations reflect a unity of interest and ownership in that Mr. Radvinsky owns all of the corporations and operates them to the same end, and dominates them so completely that any separate personalities of himself and such corporations no longer exist.

77.    Adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.  The foregoing allegations reflect that Mr. Radvinsky habitually uses his corporations as part of a "shell game," to move around assets for his convenience and shield himself from accountability.  He conducts business through bogus corporations and has proven himself untrustworthy, even under oath.  Allowing Mr. Radvinsky to interpose his sham corporations to evade legal responsibility for actions that he directed and controlled would perpetrate fraud, injustice, and inequity, by denying Plaintiff an effective remedy for the harm caused by those actions, and allowing Mr. Radvinsky the windfall of not even having to defend his ill-gotten gains. Further evidence of Mr. Radvinsky's fraudulent intent may be found in the manner in which he sought to hide his personal participation in the infringing MFC web

sites as a reflexive response to having been sued personally in this action.  Other courts have seen through Mr. Radvinsky's ruses and held him personally accountable for the misdeeds perpetrated by his Internet sites.  This Court should do likewise.

### (2) Defendant MFCXY

**78.** Defendant MFCXY is named as a defendant herein because it is the record owner of the registered U.S. trademark MYFREECAMS.COM and therefore theoretically should own the related goodwill.  However, nothing on the web site MyFreeCams.com suggests that MFCXY is the true owner of the site.

**79.** On information and belief, Defendant MFCXY has failed to observe requisite corporate formalities and has commingled its property with that of Defendant Radvinsky and the other Defendants herein.

**80.** Insofar as Defendant Radvinsky and/or one or more other Defendants may be responsible for the infringement alleged herein, Defendant MFCXY's status as a defendant herein should be taken as pleaded in the alternative, subject to discovery.

### (3) Defendant ActiveSoft

**81.** Defendant ActiveSoft is named as a defendant herein based on, *inter alia*, repeated past allegations by others of its involvement in infringement and computer fraud and abuse on behalf of MFC.

**82.** On information and belief, Defendant ActiveSoft has failed to observe requisite corporate formalities (for example, having failed to file a corporate report

in Illinois for 2014) and has commingled its property with that of Defendant Radvinsky and the other Defendants herein.

83.    Insofar as Defendant Radvinsky and/or one or more other Defendants may be fully responsible for the infringement alleged herein, Defendant ActiveSoft's status as a defendant herein should also be taken as pleaded in the alternative, subject to discovery.

### (4) Defendant Cybertania

84.    Defendant Cybertania is named as a defendant herein based on, *inter alia*, repeated past allegations by others of its involvement in infringement and computer fraud and abuse on behalf of MFC.

85.    In addition, Defendant Cybertania was also named as a defendant herein on the basis that Mr. Radvinsky has repeatedly represented to arbitration tribunals that Cybertania is the owner of the MyFreeCams.com web site and trademark.  While these claims were most likely convenient falsehoods, they constitute Defendant Cybertania's express representations and admissions.

86.    On information and belief, Defendant Cybertania has failed to observe requisite corporate formalities and has commingled its property with that of Defendant Radvinsky and the other Defendants herein.

87.    On information and belief, as reflected in one of Cybertania's domain name arbitrations, NFA Case No. FA0705000993007, Cybertania has had Anna Radvinsky as a non-functioning President, reflecting the sham nature of the corporation.

**88.**     Insofar as Defendant Radvinsky and/or one or more other Defendants may be fully responsible for the infringement alleged herein, Defendant Cybertania's status as a defendant herein should also be taken as pleaded in the alternative, subject to discovery.

**(5) Defendant LRAM**

**89.**     Defendant LRAM is named as a defendant herein based, *inter alia*, on repeated past allegations by others of its involvement in infringement and computer fraud and abuse on behalf of MFC.

**90.**     Pages still accessible on the MyFreeCams.com web site (which pages have been superseded) show that LRAM was at an earlier time the contact for inquiries about the site's privacy policy.

**91.**     On information and belief, LRAM has failed to observe requisite corporate formalities and has commingled its property with that of Defendant Radvinsky and the other Defendants herein.

**92.**     Insofar as Defendant Radvinsky and/or one or more other Defendants may be fully responsible for the infringement alleged herein, Defendant LRAM's status as a defendant herein should also be taken as pleaded in the alternative, subject to discovery.

## THE PATENTS-IN-SUIT

**93.**     The patents-in-suit comprise the following United States Patents, which were duly and legally issued on the dates indicated:

| Pat. No. | Issued | Title | Reference |
|----------|--------|-------|-----------|
| 8,122,141 | Feb. 21, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '141 patent |
| 8,327,011 | Dec. 4, 2012 | STREAMING MEDIA BUFFERING SYSTEM | '011 patent |
| 8,185,611 | May 22, 2012 | STREAMING MEDIA DELIVERY SYSTEM | '611 patent |
| 8,364,839 | Jan. 29, 2013 | STREAMING MEDIA DELIVERY SYSTEM | '839 patent |

94.     The patents-in-suit were developed in the course of Plaintiff's business and were assigned by Price (the inventor) to Plaintiff's predecessors in that business, which reassigned them to Plaintiff, the current operator of the business.  Plaintiff owns all rights to recover for past and ongoing infringement of the patents-in-suit.

95.     The text of the claims of each of the patents-in-suit is incorporated herein by reference.  Any descriptive matter contained herein that references said claims is provided for purposes of explanation and notice and does not limit the scope of the claims.

**Notice of the Patents-In-Suit and Infringement Thereof**

96.     The following recites a number of independent bases under which Defendants had notice and knowledge of the patents-in-suit and the manner by which they were infringing and inducing infringement thereof.

97.     Pursuant to 35 U.S.C. § 287(a), Defendants Radvinsky, MFCXY, and LRAM had notice of the '611 and '839 patents asserted in the original Complaint herein, and of their manner of infringement thereof, by reason of the filing of this action on May 16, 2014.

98.     Pursuant to 35 U.S.C. § 287(a), all Defendants herein had notice of the '141 and '011 patents (as well as the '611 and '839 patents), and of their manner of infringement thereof, by reason of the filing of this First Amended Complaint on August 19, 2014.

99.     Defendants Radvinsky and MFCXY were served in this action on May 22, 2014, and Defendant LRAM was served in this action on or about June 28, 2014, which service in each case included a copy of the original Complaint.

100.    Further, on May 16, 2014, Plaintiff sent a letter (the "Demand Letter") to Defendants Radvinsky and MFCXY, at the aforementioned 2123 Warwick Lane address, an address where both Mr. Radvinsky and Defendant MFCXY were found during the same time frame by Plaintiff's process server.  The Demand Letter gave explicit notice of seven WAG patents, including all four of the patents-in-suit, and enclosed a copy of the Complaint.  There is a presumption that properly addressed mail is received in the ordinary course.  In addition, Defendants filed a motion to dismiss the original Complaint (Dkt. 12), which, at page 8 of the supporting Brief, referred to the Demand Letter, reflected awareness of its contents (including how it was addressed), and did not deny its receipt by the recipients specified in the letter. Therefore it is reasonable to infer that the Demand Letter was received by Mr.

Radvinsky and MFCXY within approximately 3-5 days after having been sent on May 16, 2014, *i.e.*, May 19-21, 2014, and that as of such time (if not earlier), Mr. Radvinsky had actual knowledge of all of the patents-in-suit.

**101.**   Defendants' litigation counsel herein, Dennis C. Hopkins, and John P. Flynn (admitted herein *pro hac vice*) had also represented certain defendants in connection with WAG's action against Multi Media, Inc., *WAG Acquisition, L.L.C. v. Multi Media, LLC et al.*, 2:14-cv-02340-ES-JAD, filed April 11, 2014 (and accompanied by a similar demand letter), and in that capacity had become well aware of the '141 and '011 patents, as well as the other patents-in-suit herein, prior to the time the present action was originally commenced by WAG (on May 16, 2014) against Defendants Radvinsky, MFCXY, and LRAM.  On information and belief, Mr. Flynn and/or Mr. Hopkins were retained by Defendant Radvinsky in connection with this action during the same approximate time frame of May 19, 2014 - May 22, 2014 in which Defendants Radvinsky and MFCXY were served and had received the Demand Letter.

**102.**   Knowledge of the patents-in-suit and of their manner of infringement by Defendant Radvinsky is sufficient to put all of the other Defendants herein on notice thereof, due to Mr. Radvinsky's central and controlling role in the management of each of the Defendants.  On information and belief, Mr. Radvinsky is the only natural person in a position to receive and act on such information on behalf of the other Defendants (to the extent, if any, such Defendants have any independent legal existence).  Furthermore, as the sole executive in the MFC

enterprise, Mr. Radvinsky is the only person in the enterprise to whom such information would be useful.

**103.**   The earliest of the dates alleged in Pars. **97-102** by which Defendants had notice of the patents-in-suit and of their infringement thereof is herein referred to (separately as to each Defendant and each patent, to the extent if any that different Defendants may have received such notice on different dates, or notice with respect to different patents on different dates) as the "Notice Date."

## COUNT I: DIRECT INFRINGEMENT OF THE '141 PATENT

**104.**   Plaintiff repeats and realleges the allegations of paragraphs **1- 103** above as if fully set forth at length herein.

**105.**   35 U.S.C. § 271(a) provides in pertinent part as follows:

> "(a) . . . whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

**106.**   Defendants, acting individually as well as in their respective roles as alleged above, have directly infringed and are still directly infringing at least claims 1-8 and 28, 10-17, 19 and 21-23, and 24-27 of the '141 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more of said claims, by conduct including without limitation the acts alleged in the paragraphs that follow.

**107.**   The patent claims that Defendants are accused of directly infringing in this Count I and in Counts III, V, and VI are each of a nature that, in each case, may be infringed by the acts of a single actor.  Plaintiffs allege that one or more of the Defendants commit such direct infringement as a result of their operating one or more of the servers referenced in Pars. **35** and **36**.  The alleged direct infringement is carried out in some circumstances by one or more Defendants acting completely on their own, and in other circumstances in whole or in part as a result of one or more Defendants directing and controlling (and thereby causing) the infringing conduct of others.  These circumstances include (i) where one or more Defendants (or employees, agents, or contractors under their direction and control) performs all method steps or makes or uses apparatus (*i.e.*, a server) or an article of manufacture (*i.e.*, recorded software) covered by a patent claim, or (ii) where one or more Defendants exercises direction and control causing another person (*e.g.*, a user) to use apparatus (*i.e.*, a Player) or an article of manufacture (*i.e.*, recorded Player Software) covered by a patent claim.  In either scenario, the entire direct infringement is attributable to the acts of one single Defendant (or at most one group of related Defendants acting in concert), responsible for operating the relevant server.  Defendants have not been forthcoming, however, as to which of them is responsible for operating or having operated their servers at all relevant times.  Domain name registrations throughout the relevant period and other relevant indications as alleged in Pars. **45** through **77** reflect that Defendant Radvinsky is fully responsible for all of these acts.  However, since Defendants are a private corporate group and do not publicize their internal operating

arrangements, and since there is evidence as alleged herein (in Pars. **78-92**) that implicates each of the other named Defendants in the operation of Defendants' servers, Plaintiff has named each of the Defendants as potentially responsible for the direct infringement herein alleged.  Plaintiff alleges that there is sufficient evidence pleaded herein plausibly to implicate each of the Defendants in the operation of Defendants' servers, and the resulting infringement, during the period relevant to this complaint.  Plaintiff further alleges that the Defendants have at all relevant times operated under the direction and control of Defendant Radvinsky to commit the direct infringement complained of herein, and in the alternative that they have acted jointly in concert to commit said acts of direct infringement.

**108.**   As alleged above, Defendants provide their services through a large Internet server infrastructure, at least a material portion of which is located in the United States.  Defendants' direct infringement of the '141 patent results from the operation of the servers, referenced in Par. **36** above, which serve the content for Defendants' accused infringing web sites.  Such infringement results because, *inter alia*, claims 10-17, 19, and 21-23 of the '141 patent read on those servers and their software, and Defendants make and use those servers and their software.

**109.**   More particularly, Defendants' servers referenced in Par. **36** include servers that use the same "divide and conquer" approach described in the '141 patent to deliver streaming data.  Defendants' servers, *inter alia*, assign serial identifiers to sequential media data elements comprising the stream.  The servers receive, from a user system, requests for these elements specifying the identifiers.

The servers then serve the elements responsive to the requests, at a rate more rapid than the rate at which said streaming media is played back by a user.  This mechanism provides for a fast start of streaming playback, and at the same time allows the Player to moderate media flow by "pulling" data as needed, based on its own rate of consuming content.  Defendants' servers meet each and every limitation of claims 10-17 of the '141 patent and are therefore infringing.  By operating such servers, Defendants, by their actions alone, directly infringe claims 10-17 of the '141 patent.

110.   Claims 19 and 21-23 of the '141 patent concern recorded computer software that runs servers such as Defendants' servers described in Par. 36.  The software that operates Defendants' servers meets each and every limitation set forth in claims 19 and 21-23 of the '141 patent and is therefore infringing.  By operating said servers, and thereby using such computer programs, Defendants, by their actions alone, directly infringe claims 19 and 21-23 of the '141 patent.  On information and belief, Defendants also "make" such software and directly infringe for that reason also.

111.   Claims 1-8 and 28 of the '141 patent concern (i) providing a server essentially as described in Par. 36, as well as (ii) providing software ("Player Software") to implement specified functionality of a Player.  Defendants provide servers that meet the first set of requirements recited in these claims.  Through such servers, in response to requests identified by the server as having come from certain types of Players, Defendants direct and control the Players (as further

alleged below) to provide Player Software in accordance with the second set of requirements recited in these claims.  The combination of Defendants' actions in operating the servers and in Defendants' directing and controlling Players to provide Player Software make Defendants responsible for all claimed method steps and therefore for directly infringing claims 1-8 and 28 of the '141 patent.

112.    More particularly, Defendants, through their servers, direct and control users' Players as alleged in Par. 111 by, including without limitation, the following acts.  Defendants' servers read encoded information in network packets received from Players and identify the type of Player that sent the packet.  When Defendants identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants' servers.  Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

113.    Further in the alternative, and without limiting any of the foregoing allegations, Defendants also directly infringe claims 1-8 and 28 of the '141 patent under 35 U.S.C. § 271(a) by Defendants' acts combined with those of their users, with knowledge that each step of said patented methods will be performed through the combined action of Defendants and the user.

114.   Claims 24-27 of the '141 patent concern Player Software.  Defendants directly infringe claims 24-27 of the '141 patent by (i) using (as alleged below) the Player Software claimed in said claims, which Plaintiff alleges meets each and every limitation set forth in said claims and is infringing, and (ii) by directing and controlling (as further alleged below) users' use of such infringing Player Software.

115.   Defendants use infringing Player Software and thereby directly infringe claims 24-27 of the '141 patent by putting the Player Software into service by the acts alleged in Par. **111** and making beneficial use of the Player Software by using the Player Software as part of a delivery mechanism whereby Defendants deliver their streaming video content to end users through the users' Players.

116.   In the alternative, and without limiting the foregoing, Defendants also directly infringe claims 24-27 of the '141 patent by directing and controlling users' Players to use infringing Player Software in the manner alleged in Par. **111**.

117.   Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '141 patent.

118.   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT II: INDUCED INFRINGEMENT OF THE '141 PATENT

**119.**   Plaintiff repeats and realleges the allegations of paragraphs **1-118** above as if fully set forth at length herein.

**120.**   35 U.S.C. § 271(b) provides:

"Whoever actively induces infringement of a patent shall be liable as an infringer."

**121.**   In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 24-27 of the '141 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 24-27 of the '141 patent.

**122.**   The relevant "direct infringement" for purposes of this Count II and Count IV is direct infringement by consumers (users), who infringe by using Player Software (Count II) and/or Players (Count IV).  Plaintiff further alleges that it requires only one user to "use" the Player Software, and to "use" Players, as the same are claimed in the corresponding claims of the patents-in-suit (*i.e.*, claims 24-27 of the '141 patent and claims 1-4 of the '011 patent).

**123.**   Defendants' induced infringement as alleged in this Count II and in Counts IV results from numerous different actions by one or more Defendants that each induce users to directly infringe.  The basis for liability of the respective Defendants herein for such indirect infringement is substantially as alleged in Pars. **45-92** and **107**.  Further, because knowledge of Plaintiff's patents and intent to

induce infringement results, *inter alia*, from matters that have been brought to each Defendants' attention by the various forms of notice alleged in Pars. **97-103**, Plaintiff alleges that each Defendant is equally chargeable with such knowledge and intent.

124.    The Player Software meets each and every limitation of claims 24-27 of the '141 patent, and is therefore infringing.  When users use the infringing Player Software, each such user, considering only his or her acts alone, puts the Player Software, as claimed, into service, and obtains its beneficial use, thereby directly infringing claims 24-27 of the '141 patent.

125.    Defendants actively induce such direct infringement by users in a number of ways, including without limitation the following acts.  Defendants, through their servers, as aforesaid, provide to users video streams that are specially adapted to be viewed on Players running compatible Player Software, thereby inducing users to use such Players and such software.  Defendants' servers provide such streams when they identify that the user is using compatible Player Software. These streams provide a superior viewing experience that further induces the user to use Players running such Player Software when they use Defendants' service. Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software, and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

126.    Defendants, through their servers, also provide a "mobile site" at m.MyFreeCams.com, to further induce users to use infringing Players and Player

Software.  Defendants' web pages served by their servers for MyfreeCams.com contain links and text encouraging users with compatible Players to use the MyFreeCams Mobile Site.  Defendants also provide a "Super HD" video feed for the Mobile Site, further encouraging its use.

127.   The users of compatible Players are thereby induced by Defendants to directly infringe claims 24-27 of the '141 patent (*e.g.*, by using Player Software within the scope of said claims, whereby said users directly infringe such claims as aforesaid).

128.   The '141 patent is presumed valid pursuant to 35 U.S.C. § 282, and therefore presumed to contain an enabling disclosure of the matter claimed therein (pursuant to 35 U.S.C. § 112), understandable to any person of ordinary skill in the art.  On information and belief, Defendants Radvinsky and/or MFC are themselves of such a skill level, or have personnel of such a skill level in their employ or under their direction or control, in the subject matter areas in which Defendants are alleged to be infringing, and therefore should be expected to understand what is claimed in the '141 patent.

129.   As a consequence of the foregoing, since at least as early as the Notice Date, Defendants have engaged in such inducement with knowledge of the '141 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 24-27 of the '141 patent; with knowledge that the users directly infringe claims 24-27 of the '141 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to use

infringing Player Software and thereby infringe the '141 patent; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '141 patent.

130.   Defendants knew or should have known that their server configurations, the Player detection mechanisms built into their servers, their redirection of requests to servers compatible with the detected Player, their setting up of separate web sites for certain Players, and their providing instructions suggesting that users use such Players, were all serving to induce users of their streaming services to use Players and Player Software, and indeed were designed for the purpose of doing so.

131.   Defendants knew or should have known that the users' use of Player Software infringes the '141 patent.  Defendants knew or should have known of such infringement because they know the Player platforms that they support, know that the Players are computers or "embedded devices" driven by software (*i.e.*, Player Software), and know that that the supported Players ***must*** incorporate Player Software that operates in the manner claimed in the '141 patent in order to be interoperable with Defendants' servers.

132.   Defendants knew or should have known how the Players they specifically elected to support functioned, because they designed or selected servers specifically to support those Players.  Defendants knew or should have known that, in order to work with Defendants' servers, the Players they elected to support ***must*** request the media data elements comprising the program stream by

their serial numbers; maintain a record of what the Player has already received; and keep requesting the media data elements to maintain a sufficient number of them in the Player's buffer until the entire program has been received.  Since the foregoing reflects each and every limitation concerning Player Software in the claims of the '141 patent, anyone of ordinary skill in the art, including Defendants and their personnel, should readily have understood that MFC's users directly infringed by using Players and Player Software in the manner induced by Defendants by and in connection with their servers.

133.   Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' induced infringement of the '141 patent.

134.   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' induced infringement of the '141 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT III: DIRECT INFRINGEMENT OF THE '011 PATENT

135.   Plaintiff repeats and realleges the allegations of paragraphs **1-134** above as if fully set forth at length herein.

136.   Defendants, acting individually, as well as in their respective roles as alleged above, have directly infringed and are still directly infringing claims 1-4 of

the '011 patent by using Players that embody one or more of said claims, by conduct including without limitation the acts alleged in the paragraphs that follow.

137.   Defendants infringe such claims directly, (i) by using said Players, which Plaintiff alleges meet each and every limitation set forth in said claims and are infringing, and (ii) independently of the infringement that exists as a result of such use, by directing and controlling users' use of such infringing Players.

138.   Defendants use infringing Players and thereby directly infringe claims 1-4 of the '011 patent by putting the Players into service by the acts alleged in Par. **112** and making beneficial use of the Players by making the Players part of a delivery mechanism whereby Defendants deliver their streaming video content to end users.

139.   Defendants direct and control users' Players by, including without limitation, the following acts.  Defendants' servers read encoded information in network packets received from Players and identify the type of Player that sent the packet.  When Defendants identify a Player as compatible with Defendants' video stream, Defendants' servers send such Players electronic instructions that cause the Players, without any user intervention, to load and execute the Player Software (thereby putting the Players and Player Software into service), so that the Player may then request and receive the serialized streaming transmissions from Defendants' servers.  Defendants' servers also send electronic data to the Players containing the serial identifiers used by the Players to request streaming media elements, thereby further controlling the operation of the Players.

**140.**   Plaintiff is entitled to recover all past, present, and ongoing damages it has sustained as a result of Defendants' direct infringement of the '011 patent.

**141.**   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT IV: INDUCED INFRINGEMENT OF THE '011 PATENT

**142.**   Plaintiff repeats and realleges the allegations of paragraphs **1-141** above as if fully set forth at length herein.

**143.**   In addition and in the alternative to Plaintiff's allegations of direct infringement of claims 1-4 of the '011 patent, and without limiting anything alleged in connection therewith, Plaintiff alleges that Defendants, by conduct more particularly alleged in the paragraphs that follow, also actively induce infringement, by users, of claims 1-4 of the '011 patent.

**144.**   The users' Players meet each and every limitation of claims 1-4 of the '011 patent, and are therefore infringing.  Plaintiff alleges that it requires only one user to "use" a Player, as the same is claimed in claims 1-4 of the '011 patent. When users use infringing Players, each such user, considering only his or her acts alone, puts the Player, as claimed, into service, and obtains its beneficial use, thereby directly infringing claims 1-4 of the '011 patent.

145.   Defendants actively induce such direct infringement by users in numerous of ways, including without limitation, the following acts.  Defendants, through their servers, as aforesaid, provide to users video streams that are specially adapted to be viewed on Players running compatible Player Software, thereby inducing users to use such Players.  Defendants' servers provide such streams when they identify that the user is using a compatible Player.  These streams provide a superior viewing experience that further induces the user to use such Players when they use Defendants' service.  Defendants' servers send electronic instructions causing the Players to load and execute compatible Player Software, and electronic data containing the serial identifiers for the Players to use to request sequential media data elements.

146.   Defendants, through their servers, also provide a "mobile site" at m.MyFreeCams.com, to further induce users to use infringing Players and Player Software.  Defendants' web pages served by their servers for MyfreeCams.com contain links and text encouraging users with compatible Players to use the MyFreeCams Mobile Site.  Defendants also provide a "Super HD" video feed for the Mobile Site, further encouraging its use.

147.   The users of such Players are thereby induced by Defendants to directly infringe claims 1-4 of the '011 patent (*e.g.*, by using Players within the scope of said claims, whereby said users directly infringe such claims as aforesaid).

148.   The '011 patent is presumed valid pursuant to 35 U.S.C. § 282, and therefore presumed to contain an enabling disclosure of the matter claimed therein (pursuant to 35 U.S.C. § 112), understandable to any person of ordinary skill in the art.  On information and belief, Defendants Radvinsky and/or MFC are themselves of such a skill level, or have personnel of such a skill level in their employ or under their direction or control, in the subject matter areas in which Defendants are alleged to be infringing, and therefore should be expected to understand what is claimed in the '011 patent.

149.   As a consequence of the foregoing, since at least the Notice Date, Defendants have engaged in such inducement with knowledge of the '011 patent; with knowledge that users' Players use Player Software meeting the limitations of claims 1-4 of the '011 patent; with knowledge that the users directly infringe claims 1-4 of the '011 patent when they use Player Software; with knowledge of how Defendants' conduct actively induces users to use infringing Players and thereby infringe the '011 patent; and with the specific intent to cause such infringement, knowing that the users' acts constitute direct infringement of the '011 patent.

150.   Defendants knew or should have known that their server configurations, the Player detection mechanisms built into their servers, their redirection of requests to servers compatible with the detected Player, their setting up of separate web sites for certain Players, and their providing instructions suggesting that users use such Players, were all serving to induce users of their

Case 2:14-cv-03196-ES-MAH   Document 18   Filed 08/21/14   Page 52 of 67 PageID: 141

52

streaming services to use Players and Player Software, and indeed were designed for the purpose of doing so.

151.   Defendants knew or should have known that the users' use of Players infringes the '011 patent.  Defendants knew or should have known of such infringement because they know the Player platforms that they support, and know that the supported Players *must* operate in the manner claimed in the '011 patent in order to be interoperable with Defendants' servers.

152.   Defendants knew or should have known how the Players they specifically elected to support functioned, because they designed or selected servers specifically to support those Players.  Defendants knew or should have known that, in order to work with Defendants' servers, the Players they elected to support *must* request the media data elements comprising the program stream by their serial numbers; maintain a record of what the Player has already received; and keep requesting the media data elements to maintain a sufficient number of them in the Player's buffer until the entire program has been received.  Since the foregoing reflects each and every limitation concerning Players in the claims of the '011 patent, anyone of ordinary skill in the art, including Defendants and their personnel, should readily have understood that MFC's users directly infringed by using Players in the manner induced by Defendants by and in connection with their servers.

**153.**   Plaintiff is entitled to recover all damages it has sustained since at least as early as the Notice Date, and all such ongoing damage, as a result of Defendants' induced infringement of the '011 patent.

**154.**   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for Defendants' induced infringement of the '011 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT V: DIRECT INFRINGEMENT OF THE '611 PATENT

**155.**   Plaintiff repeats and realleges the allegations of paragraphs **1-154** above as if fully set forth at length herein.

**156.**   Defendants, acting individually as well as in their respective roles as alleged above, have directly infringed and are still directly infringing the '611 patent by making, selling, offering to sell, performing, and using apparatus and methods that embody one or more claims thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

**157.**   Among the servers that Defendants operate are servers that employ the buffering (temporary storage) scheme claimed in the '611 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions.  Those servers send initial streaming media elements to Players at an initial sending rate more rapid than the playback rate of the media stream to fill a buffer in the user's Player, and thereafter send further streaming

media data elements to the Player at about the playback rate.  Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '611 patent.  Defendants, by using and operating, and on information and belief, making, such servers, directly infringe the '611 patent.

158.   Plaintiff alleges that the methods for distributing streaming media as claimed in claim 1 of the '611 patent and its dependent claims can be infringed by one actor, and that Defendants, individually and/or in their respective roles as alleged herein perform all of the acts of said one actor necessary to infringe each of said claims.

159.   Plaintiff is entitled to recover all past, present, and continuing damages so sustained by Plaintiff as a result of such direct infringement.

160.   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '611 patent, in an amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT VI: DIRECT INFRINGEMENT OF THE '839 PATENT

161.   Plaintiff repeats and realleges the allegations of paragraphs **1-160** above as if fully set forth at length herein.

162.   Defendants, acting individually as well as in their respective roles as alleged above, have directly infringed and are still directly infringing the '839 patent by making, selling, offering to sell, performing, and using apparatus and

methods that embody one or more claims thereof, by conduct including without limitation the acts alleged in the paragraphs that follow.

163.   Among the servers that Defendants operate are servers that employ a buffering scheme as claimed in the '839 patent, to control transmission of streaming media to achieve fast startup of the playback and rapid recovery from interruptions.  Those servers load a buffer on the server with streaming media data elements, send an initial amount of streaming media elements to Players at an initial sending rate more rapid than the playback rate, and thereafter send further streaming media data elements to the Player at about the playback rate. Defendants' servers perform these functions in a manner that meets each and every limitation of one or more claims of the '839 patent.  Defendants, by using and operating, and on information and belief, making, such servers, directly infringe the '839 patent.

164.   Plaintiff alleges that the methods for distributing streaming media as claimed in claim 1 of the '839 patent and its dependent claims can be infringed by one actor, and that Defendants, individually and/or in their respective roles as alleged herein perform all of the acts of said one actor necessary to infringe each of said claims.

165.   Plaintiff is entitled to recover all past, present, and continuing damages so sustained by Plaintiff as a result of such direct infringement.

166.   Pursuant to 35 U.S.C. § 284, Plaintiff is entitled to not less than a reasonable royalty for the use made by the Defendants under the '839 patent, in an

amount subject to proof at trial, together with interest and costs as fixed by the Court.

## COUNT VII: WILLFUL INFRINGEMENT

**167.**    Plaintiff repeats and realleges the allegations of paragraphs **1- 166** above as if fully set forth at length herein.

**168.**    35 U.S.C. § 284 provides in pertinent part as follows:

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed."

**169.**    35 U.S.C. § 285 provides as follows:

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."

**170.**    From at least the Notice Date, Defendants knew of Plaintiff's patents, should therefore, as alleged in Pars. **128** and **148,** knew or should have known what the claims of those patents covered, and knew or should have known that their own activities as alleged herein created an objectively high likelihood of infringement of valid patents.  Further, as alleged in Pars. **128-132** and **148-152**, Defendants knew or should have known that they were inducing their users to infringe Plaintiff's patents.

**171.**    Notwithstanding possession of such knowledge for several months, Defendants have continued their infringing conduct without modification or moderation, and indeed have significantly expanded the scope of their infringement, without compensation to Plaintiff, and without any legal

justification, thereby demonstrating their indifference to legal obligations and the property rights of others, and their reckless disregard for Plaintiff's patents and/or their intentional infringement thereof.

**172.**   Defendants' continued and expanded infringement since at least the Notice Date is willful and deliberate, entitling Plaintiff to increased damages under 35 U.S.C. § 284.

**173.**   Defendants' continued and expanded reckless or intentional infringement since at least the Notice Date renders this an extraordinary case under 35 U.S.C. § 285, which entitles Plaintiff to an award of reasonable attorneys' fees.

**174.**   As set forth in detail above, Defendant Radvinsky is the controlling agent, driving force and dominant persona behind MFC's acts of continuing, deliberate, willful and intentional infringement of Plaintiff's patents, and is personally liable for such increased damages and attorneys' fees.

**175.**   Plaintiff has no available injunctive remedy at this time to mitigate Defendants' continuing willful infringement.  Plaintiff provides a "business-to-business" (B2B) service to content providers, and in particular radio station operators, whereas Defendants operate as direct content providers for users or "business-to-consumer" (B2C) services.  Accordingly, despite a high probability of success on the merits, the non-competitive current positioning of the parties cuts against the availability of preliminary injunctive relief, not because of any shortcomings on the merits, but rather because of factors concerning irreparable harm unrelated to the merits.  Plaintiff thus lacks an adequate remedy by way of a

58

preliminary injunction to prevent ongoing willful infringement by the Defendants. Not imposing liability for willful infringement for the Defendants' continuing infringing conduct would allow Defendants to continue and keep expanding their knowing, intentional infringement with impunity, at no additional cost, and would be unjust.

## DEMAND FOR JURY TRIAL

**176.** Plaintiff demands trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff WAG ACQUISITION, L.L.C. demands judgment in its favor and against Defendants as follows:

a) Declaring that each of the Defendants has and/or continues to directly infringe and/or induce infringement of one of more claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

b) Declaring that each of Defendants' infringement has been willful, and awarding enhanced damages at least from the Notice Date as a result of that willfulness under 35 U.S.C. § 284, jointly and severally against the Defendants;

c) Awarding the past and continuing damages arising out of Defendants' direct infringement of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839 and damages at least from the filing of this action and/or receipt of the Demand Letter for Defendants' induced infringement as alleged herein, to

Plaintiff, together with prejudgment and post-judgment interest, in an amount according to proof, jointly and severally against the Defendants;

d) Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law, jointly and severally against the Defendants;

e) Upon the final judgment of infringement herein, entering an order, pursuant to 35 U.S.C. § 283, permanently enjoining and restraining Defendants and their respective officers, directors, principals, agents, servants, employees, successors and assigns, and all those in active concert or participation with each of the foregoing, from infringing, and/or inducing the infringement of, any claims of United States Patent Nos. 8,122,141, 8,327,011, 8,185,611, and 8,364,839;

f) Awarding costs in this action to Plaintiff; and

g) For such other and further relief as the Court may deem just and proper.

Dated: August 21, 2014 **RONALD ABRAMSON**
**DAVID G. LISTON**
**LEWIS BAACH PLLC**
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

By: s/ Ronald Abramson
        Ronald Abramson
Tel: (212) 822-0163

By: s/ David G. Liston
        David G. Liston
Tel: (212) 822-0160

*Attorneys for Plaintiff*

**EXHIBIT A**



EXHIBIT A/Page 2

# MyFreeCams TV

Videos from conventions and trade shows, featuring the women of MyFreeCams!



AwesomeKate, AspenRae, Infinite_T

## MyFreeCams at Exxxotica Expo 2013 Atlantic City, NJ

**1 year ago**

April 19-21 2013, MFC was at Exxxotica Atlantic City. This episode of MFCTV is hosted by AspenRae, Jalyn, and CandieCane.

EXHIBIT A/Page 3



EXHIBIT A/Page 4



EXHIBIT A/Page 5

# MyFreeCams TV

Videos from conventions and trade shows, featuring the women of MyFreeCams!



## MyFreeCams at Exxxotica New Jersey 2010

**2** years ago

EXHIBIT A/Page 6



## <u>CERTIFICATE OF SERVICE</u>

On this 21st day of August, 2014, I certify that I served a copy of the foregoing First Amended Complaint and EXHIBIT A attached thereto via the Court's ECF filing system, on the attorneys for Defendants Leonid Radvinsky, MFCXY, Inc. and LRAM Company B.V.  (The additional Defendants added by the present amendment to the Complaint are to be served in accordance with Rule 4, Fed. R. Civ. P.)

Dated: August 21, 2014

<div style="margin-left:50%">

s/ Ronald Abramson

Ronald Abramson

**LEWIS BAACH pllc**

The Chrysler Building

405 Lexington Avenue

New York, NY 10174

Tel: (212) 826-7001

*Attorneys for Plaintiff*

</div>